UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
L. SCOTT TRAINUM, as Sellers'      :
Representative,                    :
                                   :
        Plaintiff,                 :
                                   :
          -v-                      :
                                   :
ROCKWELL COLLINS, INC.,            :
                                   :
        Defendant.                 :
                                   :
----------------------------------x
ROCKWELL COLLINS, INC.,            :          16-cv-7005 (JSR)
                                   :
        Counterclaim and           :          OPINION AND ORDER
        Third-party Plaintiff,     :
                                   :
          -v-                      :
                                   :
L. SCOTT TRAINUM, as Sellers'      :
Representative,                    :
                                   :
        Counterclaim Defendant,    :
                                   :
          -and-                    :
                                   :
BRADLEY SMITH, ANN BREWER, and     :
BRYAN TRAINUM,                     :
                                   :
        Third-party Defendants.    :
----------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/31/17

JED S. RAKOFF, U.S.D.J.

     On August 6, 2015, Rockwell Collins, Inc. ("RCI"), an avionics

company, acquired International Communications Group, Inc. ("ICG"),

a company that specialized in developing communications systems for

aircraft (the "Acquisition"). The terms of the Acquisition were set

out in a Stock Purchase Agreement ("SPA") between RCI and L. Scott

Trainum ("Scott Trainum"), the Chief Executive Officer and major

1

shareholder of ICG, who also acted on behalf of ICG's other shareholders in the transaction. In the months after the Acquisition, RCI came to believe that ICG officials had made false representations leading up to the signing of the SPA in order to induce RCI to purchase ICG, and that various warranties in the SPA had been breached. After RCI served a notice of claim seeking indemnification for breaches of the SPA, Scott Trainum initiated this action seeking a declaration that, inter alia, ICG did not breach the warranties in the SPA and that the remaining balance of the purchase price, which was held in escrow pending the disposition of RCI's notice of claim, should be disbursed. RCI responded by asserting counterclaims against him and three other ICG officers. Specifically, RCI asserted counterclaims for breach of contract against Scott Trainum; unjust enrichment against Ann Brewer, Bryan Trainum, and Bradley Smith; and fraud and negligent misrepresentation against all four. Bryan Trainum then asserted a counterclaim for breach of contract against RCI.

Following discovery, all parties filed motions for summary judgment. RCI moves for summary judgment on Scott Trainum's declaratory judgment claim, its breach of contract claim in part, its unjust enrichment claim against Bryan Trainum, and Bryan Trainum's counterclaim. Scott Trainum, Brewer, and Bryan Trainum (collectively, the "Seller Defendants") move for summary judgment on RCI's claims for fraud, negligent misrepresentation, and unjust

enrichment, and on part of RCI's breach of contract claim. Smith moves for summary judgment on all claims against him.

For the reasons explained below, the Court denies RCI's motion on its contract claim; grants Scott Trainum's motion on the contract claim in part and denies it in part; grants summary judgment to Scott Trainum, Brewer, and Smith on RCI's fraud claim; denies summary judgment to Bryan Trainum on RCI's fraud claim; grants summary judgment to all defendants on the negligent misrepresentation and unjust enrichment claims; denies RCI's motion with regard to Bryan Trainum's breach of contract claim; and grants in part RCI's motion on Scott Trainum's declaratory judgment claim.

The pertinent facts, undisputed except where indicated, are as follows:

RCI is an avionics company headquartered in Cedar Rapids, Iowa. Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Supp. of Joint Mot. for Summ. J. of Countercl. Def. L. Scott Trainum, Third-Party Def. Ann C. Brewer, and Third-Party Def. Bryan S. Trainum ("Seller Defs. Rule 56.1 Stmt.") ¶¶ 5-6, ECF No. 59. Prior to its acquisition, ICG was a company based in Newport News, Virginia, that designed and built satellite communications ("satcom") systems used in aircraft. Rockwell Collins Inc.'s Resp. to Countercl. Def. L. Scott Trainum, Third-Party Def. Ann C. Brewer, and Third-Party Def. Bryan S. Trainum's Statement of Undisputed Material Facts and Counter-Statement of Material Facts ("RCI Rule

56.1 Resp. to Seller Defs.") ¶ 1 (additional facts[1]), ECF No. 82. Ann Brewer was the Chief Financial Officer of ICG, and Bryan Trainum was the Vice President of Programs. Id. ¶ 2.[2] Bradley Smith assumed the role of Chief Operating Officer at ICG in January 2015. Third-Party Def. Bradley Smith's Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. Pursuant to Local Civil Rule 56.1 ("Smith Rule 56.1 Stmt.") ¶ 1, ECF No. 63.

Since the early 2000s, RCI and ICG had a business relationship in which ICG supplied RCI with satcom products. RCI Rule 56.1 Resp. to Seller Defs. ¶ 34 (additional facts). RCI's interest in acquiring ICG primarily derived from two of ICG's ongoing programs to develop satcom systems for the cockpits of commercial airplanes (the "Programs"): the Aspire-300 program, which ICG was developing for Honeywell International Inc. ("Honeywell"), and the ICS-300 program, which ICG was developing internally with the assistance of The Boeing Corporation ("Boeing"). Id. ¶ 4.

In late 2014, RCI began conducting due diligence on ICG. Id. ¶¶ 35, 39-40. Smith served as a point of contact for RCI and provided updates on the Programs, as, for example, in a presentation in February 2015. Rockwell Collins Inc.'s Resp. to Third-Party Def.

---

[1] In their responses to certain of the Local Rule 56.1 Statements, some of the parties here have submitted statements of additional facts, whose assertions are distinguished from responses to previously asserted facts by the notation (additional facts).

[2] In addition, Bryan Trainum is Scott Trainum's son. Decl. of Aaron F. Jaroff, Ex. 3 at 200, ECF No. 60.

Brad Smith's Statement of Undisputed Material Facts and Counter Statement of Material Facts ("RCI Rule 56.1 Resp. to Smith") ¶¶ 27, 31 (additional facts), ECF No. 80. Bryan Trainum also provided RCI with information on the Programs. See Rockwell Collins Inc.'s Statement of Material Facts ("RCI Rule 56.1 Stmt.") ¶¶ 12, 14, ECF No. 70. However, RCI maintains that it received only very limited information about the Programs throughout most of the due diligence period.

During the lead-up to the Acquisition, the Programs experienced some setbacks. For example, on June 3, 2015, Honeywell notified ICG that some of ICG's performance was behind schedule and expressed concern about the timely completion of the Aspire-300 project. Decl. of Michael Bhargava in Supp. of Counter-Pl. Rockwell Collins, Inc.'s Opp. to Third-Party Def. Bradley Smith's Mot. for Summ. J. ("Bhargava Decl. in Opp. to Smith Mot.") Ex. 17, ECF No. 79. In July 2015, ICG negotiated with Honeywell a six-month extension to the schedule for the Aspire-300 project, and ICG provided RCI with a copy of the Amendment to the Honeywell contract on July 10, 2015. RCI Rule 56.1 Stmt. ¶ 17; Resp. to Rockwell Collins Inc.'s Statement of Material Facts and Statement of Additional Undisputed Material Facts ("Seller Defs. Rule 56.1 Resp.") ¶¶ 17, 17(a), ECF No. 75. In addition, on June 23, 2015, Boeing sent ICG a request for additional payment based on Boeing's efforts to compensate for ICG's poor quality work. Bhargava Decl. in Opp. to Smith Mot. Ex. 19.

In July 2015, RCI sought more comprehensive information on the Programs from ICG. At RCI's request, on July 13 Smith forwarded RCI a master program schedule for the Aspire-300 and ICS-300 programs. Smith Rule 56.1 Stmt. ¶ 38; see Decl. of Mark Cuccaro in Supp. of Third-Party Defendant Bradley Smith's Mot. for Summ. J. ("Cuccaro Decl.") Ex. 6, ECF No. 64. RCI and ICG then convened a two-day series of meetings on the Programs in Newport News on July 20 and 21. RCI Rule 56.1 Resp. to Seller Defs. ¶ 43 (additional facts). The first day of meetings focused on the Aspire-300 program, while the second day focused on the ICS-300 program. See Seller Defs. Rule 56.1 Stmt. ¶ 98; RCI Rule 56.1 Resp. ¶ 98. The leaders of RCI's due diligence team, Jeff Payne and Dion Hayes, attended the meetings, as did members of RCI's engineering team, including Gregg Zupcsics. RCI Rule 56.1 Resp. to Seller Defs. ¶ 43 (additional facts). The Seller Defendants and RCI agree that Smith attended the meeting on July 20 regarding the Aspire-300 program, Id. ¶ 44, and Bryan Trainum attended and presented some material at the meeting on July 21 regarding the ICS-300 program, RCI Rule 56.1 Stmt. ¶ 14. Smith, however, states that he has no recollection of participating in either meeting. Third-Party Def. Bradley Smith's Resp. to Rockwell Collins Inc.'s Counterstatement of Material Facts ("Smith Rule 56.1 Resp.") ¶¶ 38-40, ECF No. 89.

RCI claims that ICG personnel made several representations about the progress of the Programs during those meetings. According to RCI, during the first presentation, the ICG team represented that

the Aspire-300 program had completed the Critical Design Review ("CDR") phase, had completed the "Red Label 1" stage, and had undergone sufficient "pre-qualification" testing to warrant "high confidence" that the product designed would successfully complete subsequent formal testing. RCI Rule 56.1 Resp. to Seller Defs. ¶¶ 44-46 (additional facts). During the second presentation, RCI asserts that the ICG team also represented that the ICS-300 program had completed the CDR phase, had "essentially full functionality," and had started Minimal Operational Performance Testing ("MOPS"). Id.

Following the meetings, Zupcsics emailed Bryan Trainum his notes from the meetings, which contained various details regarding the programs, and asked Bryan Trainum for suggested additions or revisions. Id. ¶¶ 47-48; Decl. of Michael Bhargava in Supp. of Counter-Pl. Rockwell Collins, Inc.'s Opp. to Countercl. Def. L. Scott Trainum, Third-Party Def. Ann C. Brewer, and Third-Party Def. Bryan S. Trainum's Mot. for Summ. J. ("Bhargava Decl. in Opp. to Seller Defs. Mot.") Ex. 27, ECF No. 83. Bryan Trainum responded that the notes "look[ed] like a good summary of the discussion," and that he was "reviewing all of the ICS-300 details . . . to ensure they were communicated correctly" and would provide clarification if needed. RCI Rule 56.1 Resp. to Seller Defs. ¶ 48 (additional facts).

After the July 20 and 21 meetings, RCI held an internal meeting to discuss the information they had gleaned regarding the Aspire-300 and ICS-300 programs. Id. ¶ 49. Relying on the

representations in those meetings, RCI decided to acquire ICG. Id. ¶ 50.

On August 6, 2015, Scott Trainum, on behalf of ICG's shareholders, and RCI executed the SPA, pursuant to which RCI acquired 100% of ICG's shares. RCI Rule 56.1 Stmt. ¶ 1; see Decl. of Michael Bhargava in Supp. of Counter-Pl. Rockwell Collins, Inc.'s Mot. for Summ. J. ("Bhargava Decl. dated Apr. 7, 2017") Ex. A ("SPA"), ECF No. 69. For these shares, RCI agreed to pay $50 million, as well as an additional $14 million depending on certain contingencies. Id. RCI deposited $4 million of the purchase price into escrow, $2 million of which was to be delivered to Scott Trainum on the eight-month anniversary of the SPA (April 6, 2016) and the other $2 million of which was to be distributed on the 16-month anniversary (December 6, 2016). Seller Defs. Rule 56.1 Resp. ¶ 2 (additional facts). Out of the purchase price, in accordance with a schedule set out in the SPA, ICG made payouts of $3,000,000, $720,000, and $3,400,000 to Bryan Trainum, Brewer, and Smith, respectively. See SPA Schedule 2.1(b)(iii).

Article IV of the SPA contained several warranties by ICG. Most consequentially for the purposes of this action, ICG provided, for each the Aspire-300 program and the ICS-300 program, an "estimate at completion" ("EAC"), i.e., an estimate of the total cost, including past costs and anticipated future costs, required to complete the project. The EAC for Aspire-300 was $6,762,114, and the EAC for ICS-300 was $9,515,643. SPA Schedule 4.11(e). ICG also warranted that

the financial statements attached to the SPA were accurate, and that ICG had no liabilities except for those disclosed in the SPA's schedules. SPA §§ 4.7, 4.24.

RCI claims that, after the Acquisition, it learned that the Programs were not nearly as far along in their development as it had understood before entering the SPA, and that both of the Programs had yet to complete certain milestones that ICG personnel had represented were already completed. Specifically, as to the ICS-300 project, RCI claims that after the Acquisition it learned that the CDR had not been completed until July 29, 2015, that the project had not yet begun MOPS testing, and that it did not have full functionality, among other defects. RCI Rule 56.1 Stmt. ¶ 21(a)-(e). As to the Aspire-300 project, RCI claims that it discovered after the Acquisition that Honeywell did not consider the CDR phase for the Aspire-300 project to have been completed, that Honeywell had rejected the Red Label 1 product that ICG submitted, that pre-qualification testing had not been completed, and that a redesign was necessary. Id. ¶ 23(a)-(i). The Seller Defendants and Smith dispute these claims. See Seller Defs. Rule 56.1 Resp. ¶¶ 21(a)-(e); id. ¶¶ 23(a)-(i); Smith Rule 56.1 Resp. ¶ 34.

As a result of the purported deficiencies, RCI contends that it had to engage in substantial redesigns of the Aspire-300 and ICS-300 products and additional work that vastly increased the costs of completing the Programs. According to RCI, the current EAC for the ICS-300 project is $19,689,000, which is $8,692,000 more than the

9

EAC provided by ICG, RCI Rule 56.1 Stmt. ¶ 22, and the current EAC for the Aspire-300 project is $22,121,000, which is $13,204,000 more than the EAC provided by ICG, id. ¶ 26. In addition, RCI claims that it discovered additional liabilities that ICG failed to disclose in the SPA.

On April 5, 2016, RCI served on Scott Trainum a notice of claim, which alleged breaches of several of the warranties in the SPA and sought indemnification for the damages that RCI claimed it sustained.[3] Seller Defs. Rule 56.1 Resp. ¶ 3 (additional facts). The notice of claim had the effect of barring the distribution of the remaining portion of the purchase price held in escrow. Id. ¶ 5 (additional facts). The parties could not resolve the dispute and, on September 7, 2016, Scott Trainum initiated this action seeking a declaratory judgment that ICG had not breached any of the provisions of the SPA referenced in RCI's notice of claim and also seeking an order for the funds in escrow to be distributed to him. See Compl. for Decl. J. ¶ 57, ECF No. 1. RCI subsequently filed counterclaims against not only Scott Trainum but also Bryan Trainum, Smith, and Brewer, see Def.-Counter-Pl. Rockwell Collins, Inc.'s Answer, Countercls., and Third-Party Compl. ("Countercls."), ECF No. 15, and Bryan Trainum filed a counterclaim against RCI for breach of contract, Third-Party Def. Bryan S. Trainum's Answer, Affirmative

---

[3] As a "Seller Indemnitor" under the SPA, see SPA Ex. A at 11, Scott Trainum is responsible for indemnifying RCI for damages resulting from ICG's breach of any of the representations and warranties in Article IV of the SPA, see SPA § 11.2(a)(i).

Defenses, and Countercl., ECF No. 29. Smith moved to dismiss RCI's claims against him, but that motion was denied. Mem. Order, Mar. 9, 2017, ECF No. 51.

Turning now to the instant motions, under Rule 56(a) of the Federal Rules of Civil Procedure summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a genuine dispute of fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), and, to award summary judgment, the court must be able to find "after drawing all reasonable inferences in favor of a non-movant" that "no reasonable trier of fact could find in favor of that party," Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). A fact is considered material "if it might affect the outcome of the suit under the governing law," and a dispute of fact is deemed "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted).

The Court first considers the motions addressed to the claim for breach of contract, which RCI asserts against Scott Trainum. To prove a breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant,

and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar.
Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (internal
quotation marks omitted).

RCI now moves for summary judgment in its favor on its breach
of contract claim based on alleged breaches of three warranties
contained in Article IV of the SPA. The breaches consist of the
underestimation of the respective EACs for the Aspire-300 and ICS-
300 projects, the failure to disclose an obligation to purchase
licenses, and the misrepresentation of the value of ICG's inventory.
Scott Trainum cross-moves for summary judgment in his favor on the
first two of those claims, as well as on breach claims arising out
of the failure to disclose an obligation to repay relocation costs
of a former employee and an alleged cost assertion from Embraer S.A.
The Court discusses each alleged breach in turn.

First, with regard to the alleged understatement of the
Programs' EACs, Section 4.11(e) of the SPA provides:

> The current Estimates at Completion (EACs) prepared by
> management of the Company for existing Contracts of the Company
> are set forth on Schedule 4.11(e) and reflect (i) all material
> costs incurred related to such Contracts in accordance with
> GAAP and (ii) reasonable and appropriate estimates to complete
> such Contracts, in each case based on actual costs incurred,
> estimates of the effort to complete such Contracts from the
> Company's engineering and program management functions and
> industry standards and past Company practices.

As noted above, Schedule 4.11(e) provided an EAC of $6,762,114 for
the Aspire-300 program, and $9,515,643 for the ICS-300 program.

RCI contends that the EACs were significantly understated
because they relied on false assumptions. Specifically, as to the

12

Aspire-300 program, RCI claims that the EAC was understated because (1) certain contractual milestones -- the CDR and Red Label 1 stages of development, as well as pre-qualification testing -- had not been completed, despite ICG's representations that they had; (2) the EAC was calculated with "unburdened" labor rates that underestimated the cost of labor; and (3) the EAC did not factor in a six-month extension to the project's timeline. RCI claims that the EAC for the ICS-300 program was understated because (1) the project was in an early stage of development, having not begun MOPS testing, finished the product's software, nor completed pre-qualification testing, and (2) it too used unburdened labor rates. Given those flawed assumptions, RCI concludes, the EACs could not be "true and correct," in violation of Section 8.1 of the SPA,[4] and they were not calculated in "accordance with GAAP" and were not "reasonable and appropriate" given "actual costs incurred" and "industry standards," in violation of Section 4.11(e).

It makes little sense to discuss whether EACs -- which are, by their very name, estimates -- are "true and correct." Rather, what must be "true and correct" is not the EACs themselves but the representation in Section 4.11(e) that the EACs reflect "reasonable and appropriate estimates" based on actual costs, ICG's practices, and industry standards. See SPA § 4.11(e). RCI fails to establish

---

[4] Section 8.1 of the SPA provides that "[t]he representations and warranties set forth in [the SPA] shall be true and correct in all [or all material] respects."

that there is no genuine dispute as to whether the EACs incorporated flawed assumptions and whether those assumptions necessarily render the EACs unreasonable.

As to the completion of milestones, while RCI focuses on its assertion that ICG, despite its representations, had not completed certain milestones for the Aspire-300 and ICS-300 projects, RCI does not show how those purported misrepresentations caused the EACs to be unreasonably low. In other words, RCI does not establish that the EACs were necessarily based on an understanding that those milestones were completed. Even if, as RCI suggests, the need to complete an outstanding milestone increases the time and cost of the project as a whole, RCI has failed to establish the premise needed to show that the EACs understated these costs, i.e., that the EACs were calculated under the assumption that further work on the milestones was not required to complete the project.

In any case, even on the assumption that the failure to account for not-yet-completed milestones could render the EACs unreasonable, there remain genuine disputes of material fact that preclude summary judgment in favor of RCI. Scott Trainum, in particular, vigorously disputes the premise of RCI's argument, viz., that each of the identified milestones was assumed to be complete when in fact it was not. To take one example, while RCI asserts that ICG did not complete the CDR on the ICS-300 project in October 2014, as ICG had represented, see RCI Rule 56.1 Stmt. ¶ 21(a), Scott Trainum contends that Boeing considered the milestone complete as of October 29,

14

2014, see Seller Defs. Rule 56.1 Resp. ¶ 21(a); see also Decl. of
Michael L. Simes ("Simes Decl.") Ex. 3 at RCI_ICG000130245
(including a Boeing presentation on the ICS-300 project that lists,
under the heading "Status/Accomplishments," the notation "Critical
Design Review (CDR) completed = 10/14/2014"), ECF No. 76. Scott
Trainum raises similar factual disputes regarding each of the other
allegedly incomplete milestones. See Seller Defs. Rule 56.1 Resp. ¶¶
21(a)-(e), 23(a)-(i). Accordingly, RCI has failed to demonstrate
that there is no genuine dispute of material fact as to whether the
milestones in question were complete and, if they were not, whether
the failure to account for their incompleteness rendered the EACs
for the Programs unreasonable.

RCI's argument that ICG appeared to use "unburdened" labor
rates, i.e., rates that do not account for overhead costs, to
calculate the EACs also does not warrant summary judgment. RCI's
sole support for the conclusion that the use of unburdened labor
rates violates industry standards comes from the declaration of Sean
Foster, RCI's employee and damages expert. Foster states only that
it is "normal industry practice and in accordance with [GAAP] to
include indirect costs," as the use of a burdened engineering labor
rate does. Decl. of Sean Foster ¶¶ 4-5, ECF No. 67. But Foster, who
makes his declaration "based upon [his] own personal knowledge and a
review of documents," id. ¶ 1, cites no basis for this assertion,
and, even if true, it does not conclusively establish that the use
of unburdened labor rates is not in accordance with GAAP or industry

15

practice. Moreover, Scott Trainum disputes RCI's claim that ICG did in fact use unburdened labor rates. Seller Defs. Rule 56.1 Resp. ¶ 22(b). Thus, RCI has not put forth undisputed material facts showing that ICG used unburdened rates and that doing so rendered the EACs unreasonable.

Nor is RCI entitled to summary judgment based on its argument that ICG failed to adjust the EAC for the Aspire-300 program to reflect a six-month extension to that program's schedule. On June 19, 2015, ICG provided RCI with an EAC for the Aspire-300 program of $6,762,114, which is the amount that was ultimately provided in the SPA. See Simes Decl. Ex. 29 at ICG010006021, ICG010006270; Bhargava Decl. dated Apr. 7, 2017 Ex. A at Schedule 4.11(e). Then, as noted above, in July 2015 ICG and Honeywell extended the completion date for the Aspire-300 program by six months. RCI Rule 56.1 Stmt. ¶ 17. Notably, in an email on July 1, 2015, shortly before ICG and Honeywell agreed to the extension, Bryan Trainum wrote that the current EAC for the Aspire-300 project would be incorrect if the end date for the project were moved. See Bhargava Decl. dated Apr. 7, 2017 Ex. U. Thus it is clear that the EAC was not adjusted, despite Bryan Trainum's indication that an extension of the schedule would affect the EAC. Yet, given that RCI has not shown what other assumptions went into the EAC and whether the EAC was reasonable before the extension to the schedule, the unaccounted-for impact of the extension alone does not establish that no rational trier of fact could conclude that the EAC for the Aspire-300 was reasonable.

16

In sum, then, RCI has not demonstrated that it is entitled to summary judgment on its breach of contract claim based on the alleged understatement of the EACs.

But neither has Scott Trainum demonstrated that he is entitled to summary judgment on RCI's contract claim in this regard. Scott Trainum contends that RCI's claim must fail because the undisputed evidence establishes that ICG reasonably calculated the EACs for the Programs in accordance with the standards specified in Section 4.11(e) of the SPA. Mem. in Opp. to Rockwell Collins Inc.'s Mot. for Summ. J. ("Seller Defs. Opp.") 5 (citing Seller Defs. Rule 56.1 Stmt. ¶¶ 54, 57-58, 70, 73-74), ECF No. 74. Yet he puts forth no evidence establishing the EACs' conformity with industry standards. See, e.g., Seller Defs. Rule 56.1 Stmt. ¶¶ 57, 73 (stating that "ICG and Defendants used ICG's material, actual costs incurred, its projection of future costs based on its labor rates, its practices and procedures, and industry standards" to formulate the EACs but not referencing any evidence that ICG complied with industry standards in doing so). Even if, as Scott Trainum argues, ICG calculated the EACs in accordance with its own practices and ICG personnel believed the EACs to be reasonable, those facts, on their own, are not sufficient to establish that there can be no genuine dispute as to the reasonableness of the EACs.

Scott Trainum also argues that RCI cannot base its contract claim on extra-contractual representations regarding the completion of milestones because the parties disclaimed making any warranties

not contained in the SPA. See SPA § 13.5 ("Except for the representations and warranties contained in Articles III, IV, and V or in any Transaction Document, as applicable, no party nor any other Person makes any express or implied representation or warranty on behalf of any Seller or Buyer, and each Seller and Buyer disclaims any such representation or warranty."). Yet this objection misses the mark: RCI's contract claim depends not on *RCI's* reliance on representations (unlike, as discussed infra, RCI's fraud claims) but rather on the *EACs'* reliance on mistaken assumptions in their calculations, which assumptions RCI alleges were also the subject of misrepresentations.

In a similar vein, Scott Trainum argues that RCI cannot base its contract claim on representations regarding the completion of milestones because, to the extent those representations were false, RCI knew of their falsity. Section 13.20 of the SPA provides that a representation or warranty made by ICG shall not be deemed waived unless one of two specified representatives of RCI[5] has "actual knowledge (without any duty of inquiry) as of the date [of the SPA's execution] of any breach or inaccuracy of any representation or warranty." However, "knowledge of any fact or circumstance that could give rise to any such breach or inaccuracy, or access to any document describing any fact or circumstance that could give rise to any such breach or inaccuracy, alone shall not constitute actual

---

[5] The two representatives referenced in the SPA are Dion Hayes and Stephen Belland. SPA Schedule 13.20.

knowledge." SPA § 13.20. Thus, even if the relevant persons at RCI were aware that, contrary to ICG's representations, certain milestones were not complete, Scott Trainum has not established that those persons had actual knowledge of a breach of the applicable warranty itself -- viz., that the EACs were calculated reasonably -- rather than of a circumstance that could give rise to an inaccuracy, which, by the terms of 13.20, does not entail a waiver of the warranty.

Accordingly, neither RCI nor Scott Trainum is entitled to summary judgment on RCI's contract claim based on the alleged understatement of the EACs, as there remain disputes of material fact with regard to whether the statuses of various milestones were appropriately factored into the EACs, whether the labor rates that ICG used in calculating the EACs conformed with industry standards, and whether the EAC for the Aspire-300 project was reasonable in light of the extension to that project's schedule.

Second, as to RCI's claim that ICG failed to disclose an obligation to purchase licenses, Section 4.7(b) of the SPA provides in relevant part that, "[e]xcept for Liabilities . . . set forth on Schedule 4.7(b), . . . [ICG] has no Liabilities of any kind or nature." Exhibit A to the SPA defines "Liability" as "any and all claims, debts, liabilities, obligations and commitments of whatever nature, whether . . . absolute or contingent, . . . or due or to become due, and whenever or however arising . . . ."

Pursuant to an agreement with Satcom 1 Aps (the "Satcom 1 Agreement"), ICG was obligated to buy at least 350 licenses, at $2200 each, which ICG had planned to use in a router that it produced. RCI Rule 56.1 Stmt. ¶ 36.[6] ICG did not list this obligation in Schedule 4.7(b) of the SPA.

Yet, under the SPA, RCI has waived its claim in this regard, as it had actual knowledge of the existence of the obligation at the time the SPA was executed. Specifically, RCI does not dispute that Dion Hayes, one of the individuals who is listed in Schedule 13.20 and whose knowledge may therefore be imputed to RCI, had received a copy of the Satcom 1 Agreement. RCI Rule 56.1 Resp. to Seller Defs. ¶ 102(g); see also Decl. of Aaron F. Jaroff ("Jaroff Decl.") Ex. 6 at 149 (Hayes testifying that he received the Satcom1 license agreement), ECF No. 60. Moreover, RCI does not dispute that it had identified the obligation to purchase licenses pursuant to the Satcom 1 Agreement during its review of that contract before the Acquisition. RCI Rule 56.1 Resp. to Seller Defs. ¶ 116; see also Jaroff Decl. Ex. 52 at RCI_ICG000027092 (including an internal RCI document from March 2015 identifying issues raised in ICG's

---

[6] Scott Trainum argues that the obligation should not be considered a liability because, at least at the time the SPA was executed, there was a market for the routers that used the licensed product and therefore there was no reason to think that ICG would have to swallow the cost of the licenses. Seller Defs. Rule 56.1 Stmt. ¶¶ 140-49, 151. But, given the broad definition of liability set out in the SPA, including all "obligations and commitments of whatever nature," no matter whether or not such obligations could be expected to prove profitable, this argument is unavailing. SPA Ex. A.

contracts, which identifies the Satcom 1 Agreement and notes that it granted ICG "a royalty based license to use the licensed software" in certain products). In addition, Hayes was copied on an email specifically listing the particular royalty payment under the Satcom1 Agreement. Simes Decl. Ex. 5 at RCI_ICG000808121.

Given that undisputed evidence, it is clear that Hayes had actual knowledge of ICG's obligation under the Satcom 1 Agreement, and thus, pursuant to Section 13.20 of the SPA, RCI waived its claim for breach of that warranty that it had no such obligation. RCI resists this conclusion, arguing that, under New York law, a buyer may expressly preserve its rights under warranties even where it knows the warranted facts are false. Although RCI is right that the law permits preserving warranties, RCI has only partially preserved its rights here, since the SPA specifies that warranties are not waived unless there is actual knowledge of their breach. See Galli v. Metz, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach . . . unless the buyer expressly preserves his rights under the warranties." (emphasis added)).

Accordingly, Scott Trainum is entitled to summary judgment as to RCI's breach claim based on the nondisclosure of the Satcom 1 Agreement.

Third, with regard to the alleged misrepresentation of the value of ICG's inventory, Section 4.7(a) of the SPA provides, in relevant part, that:

> Except as set forth on Schedule 4.7(a), the Company Financial Statements (i) have been prepared from and in accordance with the accounting book, accounts and financial records of the Company (which are maintained in accordance with GAAP) and in accordance with GAAP consistent with the Company's Accounting Practices and (ii) present fairly the financial position of the Company as of the dates set forth therein and their results of operations and cash flows for the periods set forth therein . . . .

In addition, Section 4.24 provides that ICG "maintains accurate books and records reflecting the assets and liabilities of the Business . . . ." SPA § 4.24. In the SPA, ICG warranted that it possessed an inventory balance of $3,994,145. SPA Schedule 4.7(a).

RCI claims that ICG breached the above warranties in two regards. It first claims that ICG always stated its inventory value at cost, whereas GAAP requires that inventory value be stated at the lower of cost or market value, and that this departure from GAAP led ICG to include in the inventory value $315,607 for products that had no market value and thus should have been written off. RCI Rule 56.1 Stmt. ¶¶ 39-42.[7] Yet RCI provides insufficient evidence that the

---

[7] Scott Trainum correctly notes that RCI does not provide admissible evidence in support of its contention that GAAP requires that inventory balances to be stated at the lower of cost or market value. See RCI Rule 56.1 Stmt. ¶ 39 (citing Bhargava Decl. dated Apr. 7, 2017 Ex. E at 23:4-9 (deposition transcript describing only an expert's qualifications)). RCI does, however, point to one of ICG's financial statements reproduced in Schedule 4.7(a) of the SPA, which notes that inventories "are stated at the lower of cost or market." Id. ¶ 9 (citing Bhargava Decl. dated Apr. 7, 2017 Ex. A at

22

inventory balance was in fact overstated for this reason. Brewer's deposition testimony, which RCI claims established that ICG always stated its inventory at cost, is equivocal: Brewer specifically says "typically, the cost was the cost." Bhargava Decl. dated Apr. 7, 2017 Ex. RR at 186 (including only a brief snippet of Brewer's testimony in this regard, which provides little context for her statement). The same is true of her testimony describing the decision not to write off the products in question. It is far from clear that those products had no market value, since she explains that she decided not to write off the products in part because another RCI employee said he could sell them. See id. at 148.

RCI also claims that that the inventory value contained in the SPA included $412,314 in inventory that did not exist when RCI reviewed ICG's inventory following the Acquisition. RCI Rule 56.1 Stmt. ¶ 43. But the evidence RCI puts forth to show that this inventory was missing is woefully inadequate. RCI points to a schedule of purported inventory adjustments that was attached to the notice of claims RCI sent to Scott Trainum. See Bhargava Decl. dated Apr. 7, 2017 Ex. SS. There is no indication of who compiled it or how,[8] and the notice of claims that purports to establish what the

---

ICG020012535). Thus, it is not the case that ICG made no warranty pertaining to the use of cost and market value in its inventories.

[8] In addition, the only date thereon is March 25, 2016, several months after the Acquisition, which would attenuate any claim that it reflects deficiencies in the inventory at the time of the Acquisition. Bhargava Decl. dated Apr. 7, 2017 Ex. SS.

schedule signifies constitutes allegations, not evidence. RCI also cites an undated document of unknown provenance, which describes a physical count of inventory that took place in March 2016 and resulted in an unspecified number of items being written off. Id. Ex. UU. That evidence cannot establish that there is no dispute of material fact as to whether ICG misstated its inventory balance at the time the SPA was executed. Accordingly, RCI is not entitled to summary judgment on its contract claim regarding inventory value.

Fourth, as to ICG's failure to disclose an obligation to repay relocation costs of ICG's former employee Tim Rayl, RCI states in its briefing that it no longer asserts this claim. Mem. of Law in Opp. to Countercl. Defs.' Joint Mot. for Summ. J. ("RCI Opp. to Seller Defs.") 18-19, ECF No. 81. Scott Trainum is therefore entitled to summary judgment on this claim.

Fifth, Scott Trainum seeks summary judgment on RCI's claim that ICG breached Section 4.7(b) of the SPA by failing to disclose as a liability a "cost assertion" against ICG by Embraer. RCI has not yet made any payments related to the cost assertion and is currently disputing its obligation to pay Embraer RCI Rule 56.1 Resp. to Seller Defs. ¶ 74 (additional facts); Bhargava Decl. in Opp. to Seller Defs. Mot. Ex. 33 at 170-72. As a result, Scott Trainum argues that Embraer's cost assertion claim does not constitute a liability required to be disclosed under the SPA, and that RCI cannot show that it has suffered damages, as needed to establish a contract claim. Yet, as noted above, the SPA's broad definition of

"Liability" includes claims that are "known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due," and therefore, even if the cost assertion had not yet accrued at the time the SPA was executed and may not ultimately be owed, the SPA nonetheless required ICG to disclose it. SPA Ex. A. Further, while it is of course true that damages are a necessary element of a breach of contract claim, Scott Trainum provides no authority demonstrating that a disputed obligation to pay a third party cannot give rise to damages. See Mem. in Supp. of Joint Mot. for Summ. J. on Behalf of Countercl. Def. L. Scott Trainum, Third-Party Def. Ann C. Brewer, and Third-Party Def. Bryan S. Trainum 24 n.13, ECF No. 58 (citing Chendrimada v. Air-India, 802 F. Supp. 1089, 1092 (S.D.N.Y. 1992) (dismissing a contract claim where the plaintiff failed to allege any damages besides injuries for which a contract claim was preempted)). Thus, Scott Trainum is not entitled to summary judgment on this claim.

As a general objection to all of RCI's contract claims, Scott Trainum claims that RCI cannot show that any alleged breaches caused it damages. The Court is not persuaded. To the extent that ICG understated its liabilities, including the cost required to complete the Programs, or overstated its assets, RCI received in exchange for the purchase price a less valuable company than ICG had represented itself to be. Scott Trainum's theory that RCI's later fumbling of the Programs, rather than any earlier duplicity by ICG, is

responsible for the divergence between the EACs and RCI's current estimates of the total costs of the Programs goes to the amount, not the existence, of damages. Thus, it is not the case that RCI cannot prove the required element of damages with regard to its breach of contract claims.

A final matter regarding RCI's breach of contract claims is whether, under the SPA, a damages cap applies to those claims.[9] As noted above, the SPA requires Scott Trainum to indemnify RCI for any damages arising out of ICG's breaches of the warranties and representations in Article IV of the SPA. SPA § 11.2(a)(i), Ex. A at 11. For the alleged breaches at issue in this case,[10] the SPA specifies that Scott Trainum's liability for damages shall not exceed $5 million. SPA § 11.5(f). However, the SPA provides an exception to that limitation, as "[n]othing in the Agreement shall limit any Person's rights or remedies . . . for claims of fraud or similar claims." SPA § 11.5(j). In addition, Section 11.8, which provides that indemnification shall generally be the exclusive remedy available to the parties for breaches of the SPA, exempts

---

[9] At oral argument on the instant motions, counsel for RCI and Scott Trainum noted that the issue of a damages cap had not been fully briefed in the memoranda theretofore submitted to the Court, and the Court granted leave to file supplemental letter briefs restricted to that issue, which those parties did on May 12, 2017. See Letter Br. of Scott Trainum, Bryan Trainum, and Ann Brewer, ECF No. 99; Letter Br. of Rockwell Collins, ECF No. 100.

[10] Specifically, the limit applies to breaches of representations and warranties contained in Article IV except for those in §§ 4.3, 4.4, 4.8, and 4.23. SPA § 11.5(f). Here, RCI alleges breaches of §§ 4.7, 4.11, and 4.24.

from this requirement "claims of fraud or willful misconduct." SPA §
11.8. RCI argues that the $5 million cap should not apply to its
breach claims because ICG's breaches amounted to willful misconduct
under Section 11.8, which, it contends, encompasses any act
constituting a breach of contract if it is undertaken intentionally.
Scott Trainum contends that the cap must apply because RCI has not
established that ICG's conduct amounted to fraud, which, he argues,
is required either under Section 11.5(f) or, given New York courts'
interpretation of "willful misconduct" as requiring tortious
behavior, under Section 11.8.

The Court is not convinced by Scott Trainum's first argument in
this regard, which is that Section 11.5(f)'s enumeration of the
types of claims for which the cap does not apply must govern, even
in the face of the Section 11.8's general exemption of claims of
willful misconduct from the SPA's indemnification provisions,
because, under New York law, specific contractual provisions control
despite general provisions to the contrary. See Capital Ventures
Int'l v. Republic of Arg., 652 F.3d 266, 271 (2d Cir. 2011). But
there is nothing flatly inconsistent about those two provisions:
determining that willful misconduct that does not amount to fraud is
redressable through means other than indemnification, in accordance
with Section 11.8, in no way contravenes Section 11.5(f)'s allowance
of unlimited damages through indemnification for "fraud or similar
claims." Even if use of Section 11.8 to avoid the indemnification
cap renders moot Section 11.5(f)'s limited exception in certain

cases (e.g., one could pursue a non-indemnification remedy with no damages limit for willful misconduct that is arguably not exempted from the cap under Section 11.5(j)), Scott Trainum's interpretation similarly reads Section 11.8 out of the SPA. Thus, RCI may pursue its breach claims unhindered by the damages cap set out in Section 11.5(f) if, and only if, it can show that the breaches constituted "fraud or willful misconduct" under Section 11.8.

The Court therefore must address what "willful misconduct" under Section 11.8 means. The contract itself, as the parties agree, is governed by the law of New York, and in Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc., the New York Court of Appeals interpreted an exemption for something similar to "willful misconduct" from a contractual limitation on liability. 84 N.Y.2d 430, 433, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994). Under the contract at issue in that case, the defendant was not liable for certain consequential damages resulting from its nonperformance, but an "exception to this limitation was provided 'for intentional misrepresentations, or damages arising out of [defendant's] willful acts or gross negligence.'" Id. (emphasis and alteration in original). The plaintiff there argued, as RCI does here, that "willful acts" denoted intentional, rather than inadvertent, conduct. Id. The Court of Appeals, considering the structure of the clause referencing "willful acts" as well as the broader context of the contract, disagreed:

In excepting willful acts from defendant's general immunity
from liability . . . we think the parties intended to narrowly
exclude from protection truly culpable, harmful conduct, not
merely intentional nonperformance of the Agreement motivated by
financial self-interest. Under the interpretation tool of
*ejusdem generis* applicable to contracts as well as statutes,
the phrase 'willful acts' should be interpreted here as
referring to conduct similar in nature to the 'intentional
misrepresentation' and 'gross negligence' with which it was
joined as exceptions to defendant's general immunity from
liability for consequential damages. We, therefore, conclude
that the term willful acts as used in this contract was
intended by the parties to subsume conduct which is tortious in
nature, i.e., wrongful conduct in which defendant willfully
intends to inflict harm on plaintiff at least in part through
the means of breaching the contract between the parties.

Id. at 438 (citation omitted).

That same reasoning applies here, as Section 11.8 joins

together "claims of fraud or willful misconduct," thereby indicating

that the two "should be interpreted here as referring to conduct

similar in nature." Id. In light of that reasoning, RCI cannot

succeed in its argument that since the SPA refers disjunctively to

"fraud *or* willful misconduct," the two must be different; even if

the two are not identical, willful misconduct must nonetheless be

interpreted similarly. RCI's argument that Metropolitan Life is

limited to the interpretation of the specific contract before the

Court of Appeals, and therefore does not govern this circumstance,

also fails. The Court of Appeals did indicate that it considered the

context of the whole agreement, and particularly several instances

in which the parties shifted the risk of the defendant's

nonperformance to the plaintiff, in concluding that an

interpretation of the contract's exemption from the limitation of

liability should not place all responsibility for consequential damages on the defendant. Id. at 436-38. But RCI identifies no reason to conclude that the SPA, as a whole, manifests an intention for RCI not to bear some of the cost should the warranties therein prove inaccurate. More generally, Metropolitan Life is in accord with the ages-old New York (and common law) doctrine distinguishing breaches of contract, whether intentional or unintentional, from torts.

Moreover, though it contends that that New York courts would interpret "willful misconduct" in the SPA to encompass merely intentional breaches of contract, none of the cases that RCI cites in support of this proposition interpret that phrase in the context relevant here, i.e., within a contractual provision limiting liability. See El-Dehdan v. El-Dehdan, 978 N.Y.S.2d 239, 249 (2d Dep't 2013) (discussing willfulness in the context of contempt sanctions); Swezey v. Marra, 533 N.Y.S.2d 244, 246 (2d Dep't 1988) (discussing whether a default on an agreement to purchase a home was willful and finding that it was not because it was entirely out of the party's control); Butler v. Shorefront Jewish Geriatric Ctr., Inc., 932 N.Y.S.2d 672, 679 (N.Y. Sup. Ct. 2011) (interpreting willfulness in a statute); Scholem v. Acadia Realty Ltd. P'ship, 992 N.Y.S.2d 857, 861 (N.Y. Sup. Ct. 2014) (discussing willful misconduct as a ground for terminating an employee).[11]

---

[11] RCI also cites the Appellate Division's decision in Banc of America Securities LLC v. Solow Building Company II, LLC, but that

Thus, the Court concludes that willful misconduct under Section 11.8 requires not just an intentional breach of contract but "conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff." Metro. Life, 84 N.Y.2d at 438. The Court, however, declines at this stage to pass upon whether this standard was met here. Scott Trainum has not moved for summary judgment on this ground, and the parties' briefing does not address in any depth whether ICG's breaches of the warranties in question amounted to tortious conduct.

The Court turns next to the fraud claims, which RCI asserts against each of the defendants. "The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'" Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (per curiam) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)). Under New York law, fraud must be proven by clear and convincing evidence. Crawford v.

---

case is inapposite here because it does not interpret an exception for willful acts in a contractual limitation of liability clause, but rather discusses what constitutes an act for which a contractual limitation of liability clause cannot restrict remedies as a matter of law. 847 N.Y.S.2d 49, 54-57 (1st Dep't 2007). In any event, Solow does not support RCI's position that a merely intentional breach constitutes a willful act.

Franklin Credit Mgmt. Corp., 758 F.3d 473, 491 (2d Cir. 2014)
(citing Gaidon v. Guardian Life Insurance Co. of America, 94 N.Y.2d
330, 349-50, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999)). This is a
substantive requirement of New York law, rather than a merely
procedural one, and therefore applies even in a federal case. Also,
this standard of proof applies to "[e]ach element of the fraud
claim," "at the summary judgment stage as well as at trial." ING
Glob. v. United Parcel Serv. Oasis Supply Corp., No. 11-cv-5697
(JSR), 2012 WL 4840805, at *7 (S.D.N.Y. Sept. 25, 2012).[12] The Court
considers the claims against each of the defendants in turn.

First, as to Scott Trainum and Brewer, RCI has not pointed to
any misrepresentations that those defendants made. Rather, RCI
claims that ICG was tightly controlled by the defendants here,
suggesting that all of the defendants had actual knowledge of the

---

[12] Smith contends -- belatedly and deficiently -- that Iowa law
applies to the fraud claim against him. In his opening brief, Smith
asserted that Iowa law applied to the fraud claim for the reasons
that the Seller Defendants identified in their opening brief, though
those defendants argued only that Iowa law applied to the negligent
misrepresentation claim. Mem. of Law in Supp. of Third-Party Def.
Bradley Smith's Mot. for Summ. J. ("Smith Mem.") 9, ECF No. 62.
Nonetheless, he stated that the law of fraud in New York and Iowa
did not differ materially, effectively conceding that New York law
applied. Smith Mem. 9 n.2; see Curley v. AMR Corp., 153 F.3d 5, 12
(2d Cir. 1998) (noting that a district court sitting in diversity in
New York only proceeds to a choice-of-law analysis if there is a
conflict between New York law and the law of another forum). Given
that concession, RCI's opposition to Smith's motion used only New
York law. In his reply brief, still without undertaking any choice-
of-law analysis, Smith appealed to Iowa law. Reply Mem. of Law in
Further Supp. of Third-Party Def. Bradley Smith's Mot. for Summ. J.
("Smith Reply") 3-5, ECF No. 88. Smith has not demonstrated that
Iowa law applies, and the Court applies New York law to the fraud
claim against him.

alleged fraud such that they could be liable for it. See RCI Opp. to Seller Defs. 7, (citing People by Abrams v. Apple Health & Sports Clubs, Ltd., Inc., 80 N.Y.2d 803, 807, 599 N.E.2d 683, 587 N.Y.S.2d 279 (1992) ("Officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it.")). However, beyond the general allegation of ICG's close management, RCI puts forth no evidence of actual knowledge by either Scott Trainum or Brewer. Thus, Scott Trainum and Brewer are entitled to summary judgment on RCI's fraud claims against them.

Second, as to Bryan Trainum, RCI alleges that he made misrepresentations (1) in an email he sent to RCI on November 25, 2014, representing that the CDR for the ICS-300 program had been completed in October 2014, RCI Rule 56.1 Resp. to Seller Defs. ¶ 40 (additional facts); and (2) when he led the presentation on the ICS-300 project at the meeting on July 21, 2015, representing that the project's CDR had been completed in October 2014, that the project was currently undergoing "Minimal Operational Performance Testing ("MOPS") testing, and that the software for the product had "essentially full functionality," id. ¶¶ 44, 46; see Bhargava Decl. dated Apr. 7, 2017 Ex. L (containing slides for the July 21, 2015 presentation); id. Ex. G at 170:4-7 (Bryan Trainum's deposition testimony indicating that he gave the presentation); id. Ex. M (containing notes on the presentation taken by Gregg Zupcsics).[13]

---

[13] RCI also alleges that Bryan Trainum put together a slide presentation on December 1, 2014 containing allegedly false updates

While Bryan Trainum argues that each of the identified representations was not false or not made by him, there are conflicting accounts of who made certain statements at the July 21, 2015 meeting and the veracity of all of these statements is very much in dispute, as discussed supra with reference to RCI's breach of contract claim. See, e.g., RCI Rule 56.1 Stmt. ¶ 18; Seller Defs. Rule 56.1 Resp. ¶ 18. Thus, there is at least a dispute of fact as to whether Bryan Trainum made material misstatements.

Because RCI has not provided any direct evidence of Bryan Trainum's intent to defraud, it must establish such intent through circumstantial evidence. Doing so requires a plaintiff to "provide[] evidence of facts that support a strong inference that the defendants possessed the requisite fraudulent intent." Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 222-23 (S.D.N.Y. 2007) (internal quotation marks and citations omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

---

on the status of the Programs, but RCI does not put forth any evidence showing that Bryan Trainum actually sent this presentation to RCI, and therefore there is no evidence that it constitutes a misrepresentation to RCI.

Although Bryan Trainum contends that there is no evidence that he intended to defraud RCI, RCI has provided evidence that Bryan Trainum had a motive to defraud by virtue of the fact that he stood to receive a significant payout as a result of the Acquisition. While "[m]otives that are generally possessed by most corporate directors and officers," such as "the desire for the corporation to appear profitable" or "to keep stock prices high to increase officer compensation," are not sufficient to give rise to an inference of fraud, Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001), the Second Circuit has held that corporate insiders' misrepresentations about a corporation's performance that were made in order to inflate the stock price and sell their shares at a profit may constitute a "concrete and personal" benefit from the fraud sufficient to satisfy the motive requirement, Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000).

After the Acquisition closed, Bryan Trainum received a check from ICG for $3 million. Jaroff Decl. Ex. 3 at 199. While he maintained that he was not aware before the Acquisition that he would receive such a payment, see id., evidence in the record indicates that, preceding the Acquisition, Scott Trainum repeatedly discussed the prospect of payouts, including one to Bryan Trainum, with various ICG officers. See, e.g., Bhargava Decl. dated Apr. 7, 2017 Ex. 11. Based upon that evidence, and the reasonable inference that it is unlikely that Scott Trainum would freely discuss the subject of such payments while Bryan Trainum, his son, was wholly

unaware of the possibility that he would receive one, there is at least a dispute of material fact as to whether Bryan Trainum was aware of and was motivated by the prospect of a payout. In addition, it is undisputed that Bryan Trainum held shares in ICG that were worth approximately $150,000 at the time of the Acquisition, SPA Schedule 1(d), and his father, Scott Trainum, held shares worth roughly $30,000,000, id., which provide further grounds from which a fact finder might infer a motive to defraud.

Bryan Trainum does not dispute that he had an opportunity to commit fraud. See Novak, 216 F.3d at 307 ("Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." (quotation omitted)). Therefore there remains a dispute as to whether he intended to defraud RCI with the misrepresentations, if any, that he made. See Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984) (noting that "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment").

As for reliance, it is undisputed that RCI relied on the representations that ICG personnel made during the meetings on July 20 and 21, 2017. RCI Rule 56.1 Resp. to Seller Defs. ¶ 50 (additional facts); Countercl. Def. L. Scott Trainum and Third Party Defs. Ann C. Brewer and Bryan S. Trainum's Reply and Resp. to Rockwell Collins Inc.'s Resp. to Statement of Undisputed Material Facts and Counterstatement of Material Fact ("Seller Defs. Rule 56.1 Reply to RCI") ¶ 50, ECF No. 91. Bryan Trainum disputes, however,

that reliance on any of the alleged misrepresentations was reasonable.

"In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view." J.P. Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). Specifically, courts consider "whether the [plaintiff] received any 'clear and direct' signs of falsity, whether the [plaintiff] had access to relevant information, whether the [plaintiff] received a written (purported) confirmation of the truthfulness of the representations at issue, and whether the [plaintiff] is 'sophisticated.'" Coraud LLC v. Kidville Franchise Co., LLC, 121 F. Supp. 3d 387, 394 (S.D.N.Y. 2015) (citations omitted). With regard to the last factor (the sophistication of the plaintiff), while "[o]rdinarily there is no duty to exercise due diligence, and [courts] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness,'" "sophisticated business entities are held to a higher standard." Winnick, 350 F. Supp. 2d at 406. Thus, "a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." ACA Galleries, Inc. v. Kinney, 928 F. Supp. 2d 699, 703 (S.D.N.Y. 2013) (internal quotation marks omitted). In general, given the many considerations to weigh, "reasonable reliance is therefore a question normally reserved for the finder of fact and

not usually amenable to summary judgment." Coraud, 121 F. Supp. 3d at 394.

Bryan Trainum argues that any reliance on alleged misstatements by him was unreasonable for two main reasons. First, he claims that RCI failed to perform a satisfactory due diligence process, which could have uncovered the truth behind the alleged misstatements, despite the fact that RCI employees admitted to having misgivings about some of the information ICG provided and acknowledged having insufficient information to fully evaluate the Programs. See Seller Defs. Rule 56.1 Stmt. 121-23. Bryan Trainum has not shown, though, that RCI's investigation was clearly deficient. During the course of its due diligence process, RCI did conduct numerous meetings with ICG staff, RCI Rule 56.1 Resp. to Seller Defs. ¶ 37 (additional facts); Seller Defs. Rule 56.1 Reply to RCI ¶ 37, and solicited information from ICG about the details of the Programs, see, e.g., Jaroff Decl. Ex. 27. In order to resolve questions about the Programs that the diligence process had raised or left unanswered, RCI convened the meetings with ICG on July 20 and 21, 2015.[14] Bryan Trainum claims that this process was nonetheless insufficient

---

[14] RCI contends that its reliance is additionally justified by the fact that it went "to the trouble to insist on a written representation that certain facts [were] true" by securing the warranties in the SPA. DDJ Mgmt., LLC v. Rhone Group L.L.C., 15 N.Y.3d 147, 154, 905 N.Y.S.2d 118, 931 N.E.2d 87 (2010). Yet this argument is misplaced because RCI did not secure warranties of the truthfulness of the representations based on which it now asserts its fraud claims, viz., the completion of particular milestones and characterizations of the status of the Programs.

because RCI should have further investigated the representations made at those meetings. Essentially, he claims that RCI should not have merely sought additional information from ICG but independently investigated using other sources.

Thus, the question here is whether RCI had access -- other than from ICG -- to information that could verify or disprove the content of the alleged misrepresentations. There can be no reasonable reliance where "the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation." ACA Galleries, 928 F. Supp. 2d at 703 (quoting Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 322, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959)). In contrast, "[w]hen matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997) (quoting Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980), abrogated in part on other grounds by Peltz v. SHB Commodities, 115 F.3d 1082, 1090 (2d Cir. 1997)).

Bryan Trainum contends that information about the subject of the alleged misrepresentations was not exclusively controlled by ICG, but rather was available from other parties, including ICG's partners on the Programs, Honeywell and Boeing. But there remain

39

genuine disputes about the extent of the information available to RCI from those sources. For example, while it is undisputed that confidentiality restrictions imposed by ICG's agreement with Honeywell initially prevented RCI from obtaining certain information about the Aspire-300 program, see Jaroff Decl. Ex. 51, and that RCI eventually was permitted to access some information from Honeywell, see id. Ex. 29; id. Ex. 5 at 136, the parties dispute whether Honeywell was willing to disclose to RCI all of the information about that program that was relevant to the Acquisition. See generally Seller Defs. Rule 56.1 Stmt. ¶¶ 106-11; RCI Rule 56.1 Resp. to Seller Defs. ¶¶ 106-11. In addition, while the parties agree that RCI was able to seek information from Boeing, they dispute whether Boeing actually could provide information on the subject of the representations. See Seller Defs. Rule 56.1 Stmt. ¶ 114; RCI Rule 56.1 Resp. to Seller Defs. ¶ 114 (asserting that because ICG was developing the ICS-300 system internally with limited technical assistance from Boeing, Boeing would not have had as much information on that program as ICG did). Similarly, Bryan Trainum does not demonstrate that Esterline Avista, a third-party contractor that worked with ICG on the Programs and that communicated with RCI about the Programs, see Jaroff Decl. Ex. 18 at 135-36, could provide information that confirmed or disproved the representations, see Seller Defs. Rule 56.1 Stmt. ¶ 126. Accordingly, the Court concludes that there are genuine disputes of

fact as to whether the alleged representations pertained to facts that were peculiarly within ICG's knowledge.

Bryan Trainum also argues that, under the terms of the SPA, RCI specifically disclaimed reliance on any representations except those specifically set out in the SPA. See SPA § 13.5[15]; Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 155 (2d Cir. 1995) ("Where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." (quotation omitted)). However, "even such an express waiver or disclaimer 'will not be given effect where the facts are peculiarly

---

[15] That section provides, in relevant part:

Except for the representations and warranties contained in Articles III, IV, and V or in any Transaction Document, as applicable, no party nor any other Person makes any express or implied representation or warranty on behalf of any Seller or Buyer, and each Seller and Buyer disclaims any such representation or warranty . . . . Buyer hereby acknowledges that, subject to its reliance on the representations and warranties contained in this Agreement, it is taking full responsibility for making its own evaluation of the adequacy and accuracy of the [documents] furnished to it (including the reasonableness of the assumptions underlying such projections, estimates, risk analysis or forecasts) and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Business, the Common Stock and the Company and has been given adequate access to such information as it has requested and it shall not assert any claim against Sellers or hold Sellers liable for any inaccuracy, misstatement, or omission with respect to information furnished by Sellers or any such Person concerning Sellers and the Company.

SPA § 13.5.

within the knowledge of the party invoking it.'" Banque Arabe, 57
F.3d at 155 (quoting Stambovsky v. Ackley, 572 N.Y.S.2d 672, 677
(1st Dep't 1991)). Thus, because the Court concludes that there is a
genuine dispute as to whether the subject of the alleged
misrepresentations was peculiarly within the knowledge of ICG and
its officers, the disclaimer contained in Section 13.5 of the SPA
does not bar reasonable reliance at this stage.

There also exists a dispute of fact as to whether Bryan
Trainum's alleged misstatements caused RCI injury. Under New York
law, "[t]o establish causation, [a] plaintiff must show both that
[the] defendant's misrepresentation induced [the] plaintiff to
engage in the transaction in question (transaction causation) and
that the misrepresentations directly caused the loss about which
[the] plaintiff complains (loss causation)." Laub v. Faessel, 745
N.Y.S.2d 534, 536 (1st Dep't 2002). The latter concept "is closely
related to the common law doctrine of proximate cause." Merrill
Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir.
2007). As noted above, it is undisputed that statements at the
meetings on July 20 and 21, 2015 caused RCI to engage in the
Acquisition. Bryan Trainum contends, however, that RCI cannot show
that the alleged misrepresentations directly caused it any loss,
because those representations were too remote from any additional
costs that RCI had to expend on the Programs. Rather, Bryan Trainum
suggests, any additional costs that RCI incurred were the result of
its own mismanagement of the Programs. The Court is not persuaded

because, to the extent that the Programs required more time and expense to complete than ICG represented, RCI was damaged by receiving less in value than it had bargained for.

"New York law . . . follows the well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale." Id. Bryan Trainum argues that this case does not govern here, since RCI puts forth proof of damages not in the form of a difference between purchase price and true value but rather in the form of the additional expenditures that RCI allegedly incurred in order to bring the Programs to the status that Bryan Trainum represented the Programs had already achieved. But this argument elevates form over function. Given that the Programs were the primary reason RCI sought to acquire ICG, see Bhargava Decl. dated Apr. 7, 2017 Ex. B at 87, their value was a critical component of the value of the asset that RCI acquired. And, in turn, the Programs' value is a function of both the ultimate worth of the Aspire-300 and ICS-300 satcom systems and the cost required to develop them. Thus, because RCI has provided evidence supporting the proposition that the cost of the completing the Programs was greater than Bryan Trainum's alleged misrepresentations led it to believe, see RCI Rule 56.1 Resp. to Seller Defs. ¶¶ 59-62 (additional facts), it has raised a genuine dispute as to whether it was induced to pay more for ICG than its true value. See Merrill Lynch, 500 F.3d at 183 (assuming that the purchaser of a business

"placed value on its intrinsic qualities, including its key personnel and its financial performance," and concluding that if the purchaser proved that the defendant "fraudulently misrepresented those qualities, it may show that it has acquired an asset at a price that exceeded its true value"). Of course, whether the purported increased costs of completing the Programs were not the result of any misrepresentations, but rather of RCI's post-Acquisition actions alone, is a matter that may be proved at trial.

In sum, Bryan Trainum has not established that there is no dispute of material fact bearing on his liability for fraud, and he is therefore not entitled to summary judgment on that claim.

Third, as to RCI's fraud claim against Smith, RCI advances two theories: that Smith made misrepresentations, and that he failed to disclose certain material information. As to the former theory, RCI identifies five alleged misrepresentations: (1) in a February 2015 due diligence meeting, Smith presented misleading estimated costs of the Programs, see RCI 56.1 Resp to Smith ¶ 31 (additional facts); (2) at some point in the first half of 2015, Smith said that the Aspire-300 CDR had closed, see id. ¶ 30; (3) on July 13, 2015, Smith provided RCI with copies of the master schedules for the Programs, which represented that CDR had been completed for both of the Programs and that the Red Label 1 prototype had been completed for Aspire-300 program, see id. ¶ 33; see also Cuccaro Decl. Ex. 6; (4) ICG staff made the same representations during the meetings on July 20 and 21, 2015, see RCI 56.1 Resp to Smith ¶¶ 38, 40 (additional

facts); and (5) Smith expressed his "comfort" with the schedule for the Aspire-300 project, see id. ¶ 32.[16]

Yet RCI cannot sustain a fraud claim against Smith based on the alleged misrepresentations because RCI has not put forth evidence that it actually relied on any of them. In its opposition to Smith's motion, RCI asserts that "the evidence demonstrates that Rockwell did, in fact, rely upon the representations and omissions made by Smith," but then proceeds to cite only to evidence indicating that RCI relied on meeting notes taken during the meetings on July 20 and 21, 2015. Mem. of Law in Opp. to Countercl. Def. Bradley Smith's Mot. for Summ. J. ("RCI Opp. to Smith") 14, ECF No. 78 (citing RCI Rule 56.1 Resp. to Smith ¶¶ 41, 43 (additional facts)). But it is undisputed that Smith did not make any misrepresentations regarding the Programs during those meetings; in fact, the RCI employee on whose notes RCI claims it relied could not recall Smith saying anything at the meetings except advising the ICG staff on what questions they could answer pursuant to confidentiality agreements. Bhargava Decl. in Opp. to Smith Mot. Ex. 12 at 244-45. RCI's failure

---

[16] The fourth and fifth of these alleged misrepresentations cannot serve as the basis for a fraud claim against Smith. The fourth set of alleged misrepresentations was not made by Smith, and there is no evidence that it was made at Smith's direction, rather than simply in his presence. See RCI Rule 56.1 Resp. to Smith ¶ 38 (additional facts). The fifth purported misrepresentation is not a present statement of fact but rather, in essence, a future prediction, which ordinarily is not actionable. See Matsumura v. Benihana Nat. Corp., 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008) ("It is axiomatic . . . that predictive or opinion statements about future events, without more, are not misrepresentations.").

to put forth evidence that it actually relied on representations that Smith made, as opposed to representations that were later made by other members of the ICG staff, precludes its fraud claim against Smith based on affirmative misrepresentations.[17]

With regard to the second theory, that Smith failed to disclose material information, RCI essentially puts forth a claim of fraudulent concealment under New York law. "New York recognizes a duty by a party to a business transaction to speak . . . 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (quoting Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984)). RCI argues that Smith had oversight over the Programs, was a point person for RCI's due diligence requests, and attended the meetings between ICG and RCI on July 20 and 21, 2015, and therefore he must have known that the information being passed on to RCI during the diligence process was incomplete. See RCI Opp. to Smith 7-9. Yet, according to RCI, Smith

---

[17] In addition, it would have been unreasonable for RCI to rely on the first and second alleged misrepresentations identified above. As to the first, RCI cannot convincingly claim that it reasonably relied on the cost estimates provided by Smith roughly six months before the Acquisition when the SPA contained the EACs, which clearly superseded previous estimates of costs. The second suffers a similar defect: the testimony regarding that statement is vague and equivocal as to the venue and time period in which the statement was made as well as what Smith said, see Bhargava Decl. in Opp. to Smith Mot. Ex. 25 at 165-66, and this ambiguity renders RCI's reliance on the statement unreasonable given the more concrete assurances and information supplied to RCI during the diligence process.

failed to disclose relevant material information, specifically that Honeywell sent ICG a letter in June 2015 expressing concerns about ICG's performance, RCI Rule 56.1 Resp. to Smith ¶ 15 (additional facts); that Boeing requested additional payment from ICG in June 2015, id. ¶ 22; and that neither the respective CDRs for each of the Programs nor the ICS-300 Red Label 1 phase had been completed, id. ¶¶ 13, 20, 25.

RCI has not cited, nor has the Court encountered, authority holding that a non-party to a transaction has a duty to disclose material facts to one of the parties to the transaction based on the theory that RCI cites. See id. ("New York recognizes a duty by *a party to a business transaction* to speak . . . ." (emphasis added)); Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005) ("The elements of fraudulent concealment under New York law are: a relationship *between the contracting parties* that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance, and damage." (emphasis added)). Holding Smith, who was not a party to the SPA, personally liable for fraud for failing to correct a misrepresentation by a co-worker or to provide all information that is material to a transaction would extend this doctrine beyond its established parameters, and the Court declines to do so here.

Turning next to the claims for negligent misrepresentation, which RCI asserts against all defendants, the Court first addresses which forum's law applies to these claims. The Seller Defendants and

Smith contend that Iowa law applies, while RCI contends that New York law applies.

When determining which forum's law applies, a district court sitting in diversity in New York first evaluates whether there is a conflict between the laws of the respective fora, and, if there is, then proceeds to apply a choice-of-law analysis. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). "In tort actions, if there is a conflict of laws, New York courts apply an 'interests analysis,' under which the law of the jurisdiction having the greatest interest in the litigation is applied." Id. Under New York law, "[i]t has long been held that when the conflict pertains to a conduct-regulating rule, the law of the place where the tort occurs will generally apply, with the locus of the tort generally defined as the place of the injury." Elmaliach v. Bank of China, Ltd., 971 N.Y.S.2d 504, 514 (1st Dep't 2013). In turn, "the Second Circuit has concluded that New York courts would hold that 'loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence.'" In re Petrobras Secs. Litig., 152 F. Supp. 3d 186, 196 (S.D.N.Y. 2016) (quoting Sack v. Low, 478 F.2d 360, 366 (2d Cir. 1973)).

The Seller Defendants (and Smith, who adopts the Seller Defendants' argument in this regard) assert that Iowa's law of negligent misrepresentation differs from that of New York, and that, because RCI is based in Iowa, Iowa is the locus of the tort, which means that, under New York's choice-of-law analysis, Iowa law

governs the negligent misrepresentation claims. The Court agrees, and RCI does not seriously contest this analysis.[18] Instead, RCI argues that the SPA's choice-of-law provisions dictate that New York law applies to the claims against the Seller Defendants. Those provisions state, in relevant part, that the Seller Defendants and RCI consent to jurisdiction and venue in New York "for the purposes of any Action arising out of or relating to the Transaction [and] this Agreement," SPA § 13.11(a), and that the SPA is governed by New York law, SPA § 13.13.

This argument fails in light of the Second Circuit's decision in Finance One Public Co. v. Lehman Brothers Special Financing, Inc., 414 F.3d 325, 333 (2d Cir. 2005). In that case, the Second Circuit addressed a set of contractual choice-of-law and forum selection provisions similar to the ones here, which provided that the contract was to be governed by New York law and that, "[w]ith respect to any suit, action or proceedings relating to this Agreement," the parties consented to jurisdiction in New York. Id. at 332. The court explained that, under New York law,[19] "tort claims are outside the scope of contractual choice-of-law provisions that

_____

[18] RCI merely suggests that if the Court undertakes the interests analysis, it could consider New York's interest in the litigation based on the parties' selection of New York as a forum. RCI Opp. to Seller Defs. 23 n.7. This consideration, alone, does not tip the scales in favor of applying New York law.
[19] A court sitting in diversity in New York applies New York law to determine the scope of a choice-of-law clause. See Fin. One, 414 F.3d at 333.

specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." Id. at 335 (noting "a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action"). The court therefore held that the extra-contractual claims at issue there fell outside of the choice-of-law provision. Id. The same analysis applies here and dictates that the SPA's choice-of-law provision designating the law governing the SPA does not also entail that New York law applies to tort claims arising out of the Acquisition.[20]

RCI also argues that New York law applies to its negligent misrepresentation claim against Smith because Smith, in his motion to dismiss, appealed to the standard for negligent misrepresentation under New York law. See Mem. of Law in Supp. of Third-Party Def. Bradley Smith's Mot. to Dismiss 7-9, ECF No. 28. However, RCI does not specify which legal doctrine would prevent Smith from changing his view of the law that applies to RCI's claims, much less cite authority to that effect, nor does it suggest that it has been prejudiced by the change in theory. Thus, in accordance with the

---

[20] RCI's citation to About.com, Inc. v. Targetfirst, Inc., which came to a conclusion contrary to the one reached in Finance One, is unavailing. No. 01-cv-1665 (GBD), 2002 WL 826953, at *2 (S.D.N.Y. Apr. 30, 2002). About.com relied on the reasoning of Turtur v. Rothschild Registry Int'l Inc., 26 F.3d 304 (2d Cir. 1994). In Finance One, the Second Circuit explained that Turtur used Texas law, not New York law, to interpret the scope of the choice-of-law provision at issue and had been misinterpreted in later decisions. See 414 F.3d at 333-34.

relevant choice-of-law analysis, the Court applies Iowa law to the negligent misrepresentation claims.

Under Iowa law, the tort of negligent misrepresentation applies only to "persons who, 'in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest,' supply information to others in their business transactions." Dinsdale Constr., LLC v. Lumber Specialties, Ltd., 888 N.W.2d 644, 651 (Iowa 2016) (quoting the Restatement (Second) of Torts § 552(1)) (alterations in original). RCI argues that Dinsdale sets out a "pecuniary interest test" that provides an independent ground for finding a duty whenever one supplies information in the course of a transaction in which one has a financial stake. Applied here, RCI contends that because the defendants received payouts for their shares and/or bonuses as part of the Acquisition, they had pecuniary interests in the provision of information to RCI and therefore may be liable under Iowa law.

However, in Dinsdale the Iowa Supreme Court did not indicate that it intended to depart from the previous standard for negligent misrepresentation, under which "the tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant." Sain v. Cedar Rapids Comm. School Dist., 626 N.W.2d 115, 126 (Iowa 2001). Rather, Dinsdale expands Sain's reasoning and therefore expands the scope of the tort "beyond persons in the course of their business or

profession of supplying information" to others who have "a pecuniary interest in supplying the information," particularly, on the facts before the Dinsdale court, to a business that both sells products and supplies information to clients. 888 N.W.2d at 652. Under this expanded formulation, it still must be the case that the provider of information has a pecuniary interest in providing the information itself, rather than, for example, in a related transaction. Underscoring this point, in explaining how the pecuniary interest requirement ran through previous decisions, Dinsdale quotes Sain and other decisions that have held that adversarial relationships do not give rise to claims for negligent misrepresentation. See id. at 651 (citing Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 227 (Iowa 1998) ("[I]f the transaction at issue took place at arm's length, the plaintiff's cause of action must fail.")).

Thus, although Dinsdale expanded the class of persons who could be liable for the tort, it does not go so far as to give rise to liability against persons who do not derive a benefit from supplying information but rather make representations in the context of transactions. Since it is undisputed that the defendants were not in the business of supplying information but rather were counterparties to a business deal, under Iowa law they cannot be liable for the tort of negligent misrepresentation and are entitled to summary judgment on RCI's claim.

The Court turns next to RCI's claims for unjust enrichment

against Brewer, Bryan Trainum, and Smith, to which the parties agree

New York law applies. "The basic elements of an unjust enrichment

claim in New York require proof that (1) defendant was enriched, (2)

at plaintiff's expense, and (3) equity and good conscience militate

against permitting defendant to retain what plaintiff is seeking to

recover." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d

296, 306 (2d Cir. 2004). "However, an unjust enrichment claim will

not lie 'where it simply duplicates, or replaces, a conventional

contract or tort claim.'" Ebin v. Kangadis Food Inc., No. 13 Civ.

2311 (JSR), 2013 WL 6504547, at *6 (S.D.N.Y. Dec. 11, 2013) (quoting

Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790, 967 N.E.2d 1177,

944 N.Y.S.2d 732 (2012)).

        In response to the defendants' argument that its unjust

enrichment claim merely duplicates its tort claims, RCI contends

that the two types of claims are distinct: while its fraud and

negligent misrepresentation claims allege that defendants' actions

led to an inflation of the purchase price of ICG, its unjust

enrichment claim alleges that the defendants have wrongly retained

benefits from the transaction through their "wrongful acts,

omissions and representations." RCI Opp. to Seller Defs. 20. While

RCI may be correct that, with respect to its unjust enrichment

claim, it makes a further allegation not present in its tort claims

-- viz., that defendants were enriched by their wrongdoing[21] -- that difference would be present in any comparison of unjust enrichment claims with tort claims. RCI has therefore failed to demonstrate any significant difference between its tort and unjust enrichment claims.

Where, as here, the wrongful conduct alleged with regard to unjust enrichment and tort claims is the very same, courts have dismissed unjust enrichment claims as duplicative. See, e.g., Gordon v. Hain Celestial Grp., Inc., No. 16-cv-6526 (KBF), 2017 WL 213815, at *7 (S.D.N.Y. Jan. 18, 2017) (noting that the "[p]laintiff allege[d] that [the] defendants' alleged unjust enrichment stem[med] from . . . the very same conduct underlying her other claims," and concluding that the former would succeed or fail depending on whether the latter did). Doing so here is warranted because "[t]o the extent that [the tort] claims succeed, the unjust enrichment claim is duplicative; if [RCI's] other claims are defective, an unjust enrichment claim cannot remedy the defects." Corsello, 18 N.Y.3d at 791. For example, if RCI succeeds in proving its fraud claim against Bryan Trainum, the unjust enrichment claim based on the same fraudulent conduct would be redundant; but if RCI's fraud claim fails because, say, Bryan Trainum did not make any misrepresentation or RCI did not rely on any misrepresentation to

---

[21] The Court notes that RCI largely bases its claim that Bryan Trainum and Smith had a motive to defraud RCI on their receipt of payouts as a result of the Acquisition, and thus enrichment is not entirely absent from the tort claims either.

its detriment, finding Bryan Trainum liable for unjust enrichment
would be unwarranted. As the same is true for all defendants, they
are all entitled to summary judgment on the unjust enrichment claim.

The Court next considers Bryan Trainum's counterclaim for
breach of contract. Bryan Trainum, who took a job with RCI following
the Acquisition, alleges that RCI failed to award him the shares due
to him when he was terminated from RCI. Specifically, under his
retention agreement with RCI, he was entitled to the equivalent of
$75,000 in restricted stock units if he remained with RCI for three
years after his retention (i.e., until September 2018), but these
shares would vest immediately if he was terminated "without cause."
RCI Rule 56.1 Stmt. ¶ 29. "Cause" is defined in the agreement as
either "an act of material dishonesty made by [one] in connection
with [one's] responsibilities as an employee" or "gross misconduct."
Id. ¶ 30. In September 2016, RCI terminated Bryan Trainum's
employment. Id. ¶ 34. Bryan Trainum denies that he was notified at
the time that he was being terminated for cause. Seller Defs. Rule
56.1 Resp. ¶ 35.

RCI argues that it is entitled to summary judgment on this
claim because Bryan Trainum's misrepresentations before the
Acquisition and failure to correct them afterwards provide ample
"cause" for his termination. Yet whether Bryan Trainum and others
did make misrepresentations is very much in dispute for the reasons
discussed above with regard to RCI's fraud claim against him, and
therefore so too are whether he failed to correct any

misrepresentations and whether such conduct was the basis for his termination. See Seller Defs. Rule 56.1 Resp. ¶¶ 33.

RCI also argues that Bryan Trainum has failed to satisfy his burden to produce any evidence demonstrating that his termination was without cause. For his part, Bryan Trainum maintains that summary judgment is unwarranted unless RCI can show by undisputed evidence that his termination was for cause. There is no need to resolve this question of which side bears the burden, however, because there exists some evidentiary basis from which a factfinder might infer that RCI was motivated to terminate Bryan Trainum, not because of his misconduct, but rather because of other factors, specifically the pending litigation between RCI and defendants. Bryan Trainum was not terminated at the time RCI learned of the various alleged misrepresentations (which was in early 2016 at the latest, since RCI served its notice of claim in April 2016), but only in September 2016, which was when Scott Trainum filed this action against RCI. See Compl. for Decl. J. Taking that evidence in the light most favorable to Bryan Trainum, it is sufficient to raise a genuine issue as to whether he was fired for cause. See Benoit v. Comm. Capital Corp., No. 03 Civ. 5328 (PKL), 2008 WL 3911007, at *6 (S.D.N.Y. Aug. 25, 2008) ("[Plaintiff] generally denies all of these allegations [that there were legitimate reasons to fire him], arguing that his termination was the result of financial considerations following [defendant's] transaction . . . . Viewing the evidence in a light favorable to the non-moving party,

[plaintiff] has raised a genuine issue of material fact as to whether his termination was for cause pursuant to the Employment Agreement."). Thus, RCI is not entitled to summary judgment on Bryan Trainum's counterclaim.

Lastly, the Court considers Scott Trainum's declaratory judgment claim. To determine the propriety of ruling on a declaratory judgment claim, a court must inquire:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (5) whether there is a better or more effective remedy.

New York v. Solvent Chem. Co., 664 F.3d 22, 26 (2d Cir. 2011) (internal quotations and alterations omitted).

Where, as here, an action involves both a breach of contract claim and a declaratory judgment claim seeking a declaration that the contract was not breached, the critical question is whether resolution of the contractual dispute through adjudication of the breach claim provides a more effective remedy than litigating the declaratory judgment claim. That question, in turn, primarily depends on whether adjudication of the contract claim, which has the advantage of also allowing for damages, would resolve all of the issues that the declaratory judgment claim raises. See Intellectual Capital Partner v. Institutional Credit Partners LLC, No. 08 Civ. 10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) (holding

that, where "[a]ny cloud of uncertainty regarding the scope and enforceability of the provisions [at issue] will be dispelled in litigation of the breach of contract claim," "declaratory relief would serve no useful purpose" (internal quotation omitted)).

In the Complaint, Scott Trainum seeks a declaration of "the rights and obligations of the parties under the SPA," including declarations that Scott Trainum and the Sellers are not obligated to indemnify RCI for any claim asserted in the Notice of Claim; that ICG did not breach any warranties as alleged in the Notice of Claim, and, if it did, that RCI waived its claims of breach because it had actual knowledge of the breaches; and that indemnification is capped at $5 million. Compl. for Decl. J. at 12. All of these issues will be resolved through the litigation of RCI's contract claims, compare id. Ex. C (Notice of Claims) with Countercls. ¶¶ 58-69, and counsel for the Seller Defendants conceded as much at oral argument on these motions. Tr. dated May 5, 2017 at 4. Yet Scott Trainum also seeks, as part of his declaratory judgment claim, relief in the form of an order requiring the release of funds held in escrow, which would not necessarily follow even if Scott Trainum succeeded in defending against RCI's breach of contract claims. Thus the Court dismisses as duplicative Scott Trainum's declaratory judgment claim except to the extent that it seeks an order regarding the release of funds from escrow.

In sum, for the foregoing reasons, the Court hereby denies RCI's motion for summary judgment on its contract claim. The Court

grants Scott Trainum's motion for summary judgment on RCI's contract claim only as to the Satcom 1 Agreement and the relocation costs, and otherwise denies it. The Court also grants summary judgment to Scott Trainum, Brewer, and Smith on RCI's fraud claim, but denies summary judgment to Bryan Trainum on RCI's fraud claim. The Court grants summary judgment to all defendants on the negligent misrepresentation and unjust enrichment claims. The Court denies RCI's motion for summary judgment with regard to Bryan Trainum's breach of contract claim. Finally, the Court grants RCI's motion for summary judgment with regard to Scott Trainum's declaratory judgment claim except to the extent Scott Trainum seeks an order requiring the release of funds in escrow.

The parties are reminded that trial of all remaining claims will commence at 9:00 a.m. on September 12, 2017. The Clerk of the Court is instructed to close the motions at docket numbers 57, 61, and 66.

SO ORDERED.

Dated:     New York, NY
           May 30, 2017

_____
JED S. RAKOFF, U.S.D.J.